1  ROBERT E. OPERA -- State Bar No. 101182
   ropera@winthropcouchot.com
2  KAVITA GUPTA – State Bar No. 138505
   kgupta@winthropcouchot.com
3  **WINTHROP COUCHOT**
4  **PROFESSIONAL CORPORATION**
   660 Newport Center Drive, Fourth Floor
5  Newport Beach, CA 92660
   Telephone: (949) 720-4100
6  Facsimile: (949) 720-4111

7
   [Proposed] General Insolvency Counsel for
8  Debtors and Debtors-in-Possession

9              **UNITED STATES BANKRUPTCY COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11                  **SANTA ANA DIVISION**

12

13 In re:                              Case No. 8:11-bk-11428 RK

14 ☒ FORBCO MANAGEMENT               Jointly Administered with
     CORPORATION, a California        Case Nos. 8:11-bk-11439 RK;
15   corporation                      8:11-bk-11442 RK; and 8:11-bk-11444 RK
16 ☒ FORBCO SIZZLER PARTNERS, L.P.,
     a California limited partnership  Chapter 11 Proceedings
17 ☒ W & J HIGGINS INVESTMENTS L.P.,
     a California limited partnership  **DEBTORS' EMERGENCY MOTION FOR**
18 ☒ L & G RESTAURANTS, LLC,          **ORDER (1) AUTHORIZING USE OF ANY**
     a California limited liability company **CASH COLLATERAL OF SECURED**
19                                     **CLAIMANTS; AND (2) SETTING FINAL**
                                       **HEARING ON THE MOTION; AND**
20        Debtors and                 **MEMORANDUM OF POINTS AND**
          Debtors-in-Possession.      **AUTHORITIES IN SUPPORT OF THE**
21                                     **MOTION**
22
                                       **[DECLARATION OF RONALD JEFFREY**
23                                     **HIGGINS IN SUPPORT OF MOTION IS**
                                       **FILED CONCURRENTLY HEREWITH]**
24
                                       DATE:     February 11, 2011
25                                     TIME:     9:30 a.m.
                                       PLACE:    Courtroom 5D
26

27

28

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

# TABLE OF CONTENTS

**PAGE**

I.  STATEMENT OF FACTS ..................................................................... 6
    A.  Description of the Debtors ......................................................... 6
        1.  Forbco Management ......................................................... 6
        2.  Forbco Sizzler ................................................................ 7
        3.  W&J ............................................................................. 8
        4.  L&G ............................................................................. 9
    B.  Events Precipitating Debtors' Chapter 11 Filings ...................... 10
    C.  The Debtors' Cash Collateral Proposal ..................................... 10
        1.  Replacement Liens ......................................................... 11
        2.  Reservation of Rights ..................................................... 12
        3.  Financial Reporting ........................................................ 12
        4.  Final Hearing ................................................................ 12

II.  THE SECURED CLAIMANTS DO NOT HAVE AN INTEREST
     IN REVENUES GENERATED FROM THE DEBTORS'
     POST-PETITION SERVICES ............................................................ 13

III.  THE DEBTORS SHOULD BE AUTHORIZED TO USE ANY
      CASH COLLATERAL OF THE SECURED CLAIMANTS
      PURSUANT TO 11 U.S.C. § 363 .................................................... 16
      A.  The Adequate Protection Burden ............................................. 16
      B.  The Debtors Have Satisfied Their Adequate Protection Burden ...... 18
          1.  The Secured Claimants' Interests Are Adequately
              Protected by the Proposed Replacement Liens ..................... 19
          2.  The Secured Claimants Are Adequately Protected
              by the Maintenance and Preservation of the Debtors'
              Businesses ..................................................................... 20
          3.  The Secured Claimants Are Adequately Protected
              by a Projected Increase in Cash and Inventory .................... 21

IV.  THE DEBTORS SHOULD BE AUTHORIZED TO USE
     CASH COLLATERAL IN ORDER TO PROMOTE A SUCCESSFUL
     REORGANIZATION ....................................................................... 22

V.  GOOD CAUSE EXISTS FOR HEARING THIS MOTION ON AN
    EMERGENCY BASIS ...................................................................... 24

VI.  THE COURT SHOULD SCHEDULE A FINAL HEARING ON
     THIS MOTION AS SOON AS POSSIBLE IN ACCORDANCE
     WITH THE REQUIREMENTS OF THE BANKRUPTCY RULE ......................... 25

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

1

## TABLE OF CONTENTS

2

### (Continued)

3

PAGE

4

VII.   THE NOTICE OF THIS MOTION PROPOSED TO BE

5       GIVEN TO CREDITORS AND OTHER PARTIES-IN-INTEREST
        IS APPROPRIATE UNDER THE FACTS AND CIRCUMSTANCES

6       OF THE DEBTORS' CASE..................................................................................... 26

7

VIII.  CONCLUSION............................................................................................................ 26

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

In re Elmore,
    94 B.R. 670 (Bankr. C.D.Cal. 1988) ............................................................... 17

In re Anderson,
    86 B.R. 877 (Bankr. N.D.Ind. 1988) ............................................................... 17

In re Bering Trader, Inc.,
    944 F. 2d 500 (9th Cir. 1991) ......................................................................... 15

In re Big Hook Land & Cattle Co.,
    81 B.R. 1001 (Bankr. D.Mont. 1988) .............................................................. 13

In re Cafeteria Operators, L.P.,
    299 B.R. 400 (Bankr. N.D.Tex. 2003) ............................................................ 14

In re Cann & Saul Steel Co.,
    76 B.R. 479 (E.D.Pa. 1987) ..................................................................... 21, 23

In re Center Wholesale, Inc.,
    759 F.2d 1440 n.21 (9th Cir. 1985) ................................................................. 25

In re Century Inv. Fund, VII Ltd. Partnership,
    96 B.R. 884 (Bankr. E.D.Wis. 1989) .............................................................. 17

In re Days Inn California Riverside Limited Partnership,
    27 F. 3d 374 (9th Cir. 1994) ........................................................................... 15

In re Delbridge,
    61 B.R. 484 (Bankr. E.D.Mich. 1986) ............................................................ 13

In re Delta Resources, Inc.,
    54 F.3d 722 (11th Cir.), cert. denied, 64 U.S.L.W. 3348 (1995) ..................... 18

In re Dynaco Corp.,
    162 B.R. 389 (Bankr. D.N.H. 1993) .......................................................... 22, 24

In re Everett Home Town Limited,
    146 B.R. 453 (Bankr. D.Ariz. 1992) ............................................................... 15

In re George Ruggiere Chrysler-Plymouth, Inc.
    727 F.2d 1017 (11th Cir. 1984) ...................................................................... 24

In re Glasstream Boats, Inc.,
    110 B.R. 611 (M.D. Ga. 1990) ....................................................................... 21

## TABLE OF AUTHORITIES

### (Continued)

PAGE

In re Hamilton,
    18 B.R. 868 (Bankr. Colo. 1982) ................................................................. 13

In re Heatron, Inc.,
    6 B.R. 493 (Bankr. W.D.Mo. 1980) ............................................................ 22

In re Hotel Sierra Vista Ltd. Partnership,
    112 F.3d 429 (9th Cir. 1997) ...................................................................... 15

In re Johnson,
    90 B.R. 973 (Bankr. D.Minn. 1988) ........................................................... 17

In re Karl A. Neise, Inc.,
    16 B.R. 600 (Bankr. S.D.Fla. 1981) ........................................................... 21

In re Kessler,
    86 B.R. 134 (Bankr. C.D.Ill. 1988) ............................................................ 17

In re Kidsstop of America, Inc.,
    64 B.R. 397 (M.D. Fla. 1986) ..................................................................... 20

In re Ledgemere Land Corp.,
    116 B.R. 338 (Bankr. D.Mass. 1990) ..................................................... 17, 19

In re Martin,
    761 F.2d 472 (8th Cir. 1985) ...................................................................... 20

In re McCombs Properties VI, Ltd.,
    88 B.R. 261 (Bankr. C.D.Cal. 1988) ........................................... 16, 17, 18, 20

In re McKim,
    217 B.R. 97 (Bankr. D.R.I. 1998) ............................................................... 15

In re O'Conner,
    808 F.2d 1393 (10th Cir. 1987) .................................................................. 22

In re Pine Lake Village Apartment Co.,
    16 B.R. 750 (Bankr. S.D.N.Y. 1982) .......................................................... 21

In re Skagit Pacific Corporation,
    316 B.R. 330 (9th Cir. BAP 2004) .............................................................. 14

In re Stein,
    19 B.R. 458 (Bankr. E.D.Pa. 1982) ............................................................ 21

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

**TABLE OF AUTHORITIES**

**(Continued)**

PAGE

In re Sullivan Ford Sales,
    2 B.R. 350, 355 (Bankr. D.Me. 1980) ........................................................................ 25

In re Texas Tri-Collar, Inc.,
    29 B.R. 724 (Bankr. W.D.La. 1983) ......................................................................... 13

In re Timothy Dean Restaurant & Bar,
    342 B.R. 1 (Bankr. D.C. 2006) ................................................................................. 14

In re Transp. Design & Technology, Inc.,
    48 B.R. 635 (Bankr. S.D.Cal. 1985) ......................................................................... 13

In re Westchase I L.P.,
    126 B.R. 692 (W.D.N.C. 1991) ............................................................................... 18

United Savings v. Timbers of Inwood Forest,
    484 U.S. 365, 108 S.Ct. 626 (1988) ......................................................... 16, 17, 18

**STATUTES**

11 U.S.C. § 361 ........................................................................................................ 16, 18
11 U.S.C. § 362(d)(1) .............................................................................................. 16, 18
11 U.S.C. § 363 ........................................................................................................... 2, 15
11 U.S.C. § 363(c) ........................................................................................................... 24
11 U.S.C. § 363(c)(2) ...................................................................................................... 16
11 U.S.C. § 363(c)(2)(B) ........................................................................................... 2, 16
11 U.S.C. § 363(c)(3) ...................................................................................................... 24
11 U.S.C. § 363(e) ..................................................................................................... 16, 18
11 U.S.C. § 363(p) ........................................................................................................... 16
11 U.S.C. § 506(a) ........................................................................................................... 20
11 U.S.C. § 506(c) ........................................................................................................... 15
11 U.S.C. § 522 ............................................................................................................... 15
11 U.S.C. § 544 ............................................................................................................... 15
11 U.S.C. § 545 ............................................................................................................... 15
11 U.S.C. § 547 ............................................................................................................... 15
11 U.S.C. § 548 ............................................................................................................... 15
11 U.S.C. § 552 ........................................................................................................ 13, 15
11 U.S.C. § 552(a) ............................................................................................... 2, 13, 14
11 U.S.C. § 552(b) ................................................................................................... 13, 14
11 U.S.C. § 552(b)(1) ...................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**(Continued)**

<u>**PAGE**</u>

**RULES**

FRBP 4001(b)(1) ................................................................................................ 26

FRBP 4001(b)(2) ................................................................................................ 25

**TREATISES**

<u>Collier on Bankruptcy 15th Ed. Revised</u>, ¶ 552.02[1] (1998) ........................... 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

1      Forbco Management Corporation, a California corporation ("Forbco Management");

2  Forbco Sizzler Partners, LP, a California limited partnership ("Forbco Sizzler"); W&J Higgins

3  Investments, L.P., a California limited partnership ("W&J"); and L&G Restaurants, LLC, a

4  California limited liability company ("L&G"), the jointly administered debtors and debtors-in-

5  possession in the above-captioned Chapter 11 proceedings (collectively, the "Debtors"), hereby

6  move the Court, on an emergency basis, for an order (i) authorizing the Debtors to use any "cash

7  collateral," as the term "cash collateral" is defined in 11 U.S.C. § 363, of any secured claimants in

8  this case (collectively, "Secured Claimants"), including but not limited to any cash collateral of

9  Irwin Franchise Capital Corporation ("First Franchise") and any tax lien claimants, and to grant to

10 the Secured Claimants post-petition replacement liens as and for adequate protection of the

11 Debtors' use of any cash collateral of the Secured Claimants, on the terms set forth herein; and

12 (ii) setting a final hearing on this Motion.

13     The Debtors filed voluntary Chapter 11 petitions for relief on January 31, 2011 ("Petition

14 Date"), and the Debtors' cases have been jointly administered by an order of the Court entered on

15 February 8, 2011.  The Debtors operate a total of fourteen (14) "Sizzler" restaurants.  The Debtors

16 are operating their businesses as debtors-in-possession pursuant to the provisions of Sections 1107

17 and 1108 of the Bankruptcy Code.

18     As of the Petition Date, the Debtors owed First Franchise the approximate amount of

19 $2,230,000, in the aggregate.  First Franchise asserts that its claim is secured by a first-priority lien

20 encumbering virtually all of the Debtors' assets, including any cash collateral.  Since First

21 Franchise, and perhaps other Secured Claimants, assert perfected liens against the Debtors' cash

22 and cash equivalents, the Debtors seek from the Court authority, pursuant to Section 363(c)(2)(B)

23 of the Bankruptcy Code, to use any cash collateral.

24     As set forth in detail hereinbelow, good cause exists for this Court to grant to the Debtors

25 authority for the Debtors to use any cash collateral of the Secured Claimants.  First, the Secured

26 Claimants' interests in the Debtors' post-petition cash collections will be very limited, because the

27 Debtors' collections are largely generated from services.  Since Section 552(a) of the Bankruptcy

28 Code eliminates liens on "after acquired property," such as property derived from post-petition

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

1   services, the Secured Claimants' interests in post-petition collections will be limited to the value of

2   proceeds that are derived from, or attributable to, the limited amount of inventory and any other

3   cash collateral in existence on the Petition Date. Second, the Secured Claimants' interests in cash

4   collateral will be adequately protected by replacement liens to the extent of the value of any cash

5   collateral. Third, the Secured Claimants' interests in cash collateral will be adequately protected

6   through the maintenance of the prepetition cash and inventory levels in these cases.

7          In order to prevent disruption to the Debtors' business operations, the Debtors respectfully

8   request that this Court grant this Motion on an emergency basis. As set forth in detail in the

9   Declaration of Ronald Jeffrey Higgins filed concurrently herewith ("Higgins Declaration"), the

10  Debtors require the immediate use of cash collateral in order to pay for a wide variety of goods and

11  services necessary to the continued operations of the Debtors' businesses. The Debtors must

12  purchase food inventory on almost a daily basis, and must pay timely their payroll obligations.

13  Any interruption in the work of the Debtors' employees or in the level of goods and services

14  provided to the Debtors' businesses will have a very detrimental impact on the Debtors' efforts to

15  reorganize their financial affairs.

16         The Debtors seek hereby approval for the use of any cash collateral of the Secured

17  Claimants on the following terms:

18         1.    Replacement Liens. The Debtors will grant to each of the Secured

19         Claimants replacement liens encumbering each of the respective Debtors' post-petition

20         cash and inventory, and the proceeds of the foregoing, to the same extent and priority as

21         any duly-perfected and unavoidable liens in cash collateral held by the respective Secured

22         Claimants as of the Petition Date, limited to the amount of any such cash collateral of the

23         respective Secured Claimants as of the Petition Date, to the extent that any cash collateral

24         of the respective Secured Claimants is actually used by the respective Debtors.

25         2.    Reservation of Rights. The Debtors, any committee of unsecured creditors

26         that may be appointed in the Debtors' cases ("Committee") and all other parties-in-interest

27         will reserve any and all rights that they may have to object to the claims of the Secured

28         Claimants, and to object to the validity, priority and extent of the Secured Claimants' liens,

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

1    if any, encumbering the Debtors' assets. Without limiting the generality of the foregoing,

2    the Debtors will reserve the right to object to the extent of any liens that the Secured

3    Claimants may assert in the Debtors' cash as of the Petition Date.

4        3.    Financial Reporting. The Debtors will provide to the Secured Claimants

5    reports regarding the amounts of cash and inventory that each Debtor has as of the end of

6    each reporting period versus the amount of cash and inventory that each Debtor had as of

7    the Petition Date. These initial cash collateral reports will be provided to each Secured

8    Claimant about two weeks after the Petition Date, and thereafter will be provided to each

9    Secured Claimant on a monthly basis. Moreover, the Debtors will provide to the Secured

10   Claimants copies of the interim statements and operating reports required to be submitted

11   to the Office of the United States Trustee ("U.S. Trustee") as such documents are submitted

12   to the U.S. Trustee.

13       4.    Final Hearing. The Debtors will reserve the right to seek, at the final

14   hearing on this Motion, use of any cash collateral of the Secured Claimants on terms

15   different from those contained in this Motion.

16   As discussed hereinbelow, the Debtors respectfully submit that the Debtors' cash collateral

17   proposal is fair, provides adequate protection of any interests of the Secured Claimants in cash

18   collateral, and will enable the Debtors to continue their business operations, to the benefit of the

19   Debtors, the Secured Claimants and the Debtors' other creditors. None of the provisions in this

20   motion grant the Secured Claimants rights that would require additional disclosure to the Court

21   under the Local Rules.

22   This Motion is made and based upon the foregoing allegations and representations, the

23   Memorandum of Points and Authorities attached hereto, the Higgins Declaration filed concurrently

24   herewith, the papers, pleadings and other documents on file in the Debtors' Chapter 11 cases, and

25   upon such other evidence, both oral and documentary, that may be submitted to the Court at or

26   before the time of the hearing on this Motion.

27

28

-4-

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

1     WHEREFORE, the Debtors request that this Court enter its order:

2         1.      Authorizing the Debtors' immediate, interim use of any cash collateral of

3     the Secured Claimants pursuant to the terms and conditions contained in this Motion,

4     pending a final hearing on notice to creditors;

5         2.      Authorizing each debtor to pay its share of Forbco Management's overhead

6     costs;

7         3.      Setting a final hearing on this Motion; and

8         4.      Granting to the Debtors such other and further relief as may be just and

9     appropriate under the facts and circumstances of this case.

10    DATED:  February 9, 2011                    **WINTHROP COUCHOT**
11                                                **PROFESSIONAL CORPORATION**

12
                                                  By:___/s/ Robert E. Opera_____
13                                                     Robert E. Opera
                                                       Kavita Gupta
14                                                [Proposed] General Insolvency Counsel for
15                                                Debtors and Debtors-in-Possession

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### STATEMENT OF FACTS

4    **A.    Description of the Debtors.** The Debtors own and operate a total of fourteen (14)

5    "Sizzler" brand restaurants in Southern California.[1] Each Debtor owns four restaurants, with the

6    exception of L&G, which owns two restaurants. The Debtors' business affairs are administered, in

7    part, by Forbco Management, which was founded by Ronald F. Higgins in 1972, and which is now

8    owned and controlled by him and by his son, Ronald Jeffrey Higgins, who serves as Forbco

9    Management's President. A description of the Debtors' financial affairs is set forth in the

10   following subparagraphs.

11      **1.    Forbco Management.** Forbco Management operates Sizzler restaurants

12   from the following leased locations:

13

| Store No. 3 | 730 S. Arroyo Parkway, Pasadena, CA 91105 |
| --- | --- |
| Store No. 12 | 900 N. Citrus Avenue, Covina, CA 91722 |
| Store No. 14 | 9480 Warner Avenue, Fountain Valley, CA 92708 |
| Store No. 15 | 2228 S. Mountain Avenue, Ontario, CA 91761 |

17        In addition to these operating locations, Forbco Management leases office space for

18   its headquarters facility that is located at 27121 Towne Center Drive, Suite 250, Foothill Ranch,

19   CA 92610-2806.

20        Forbco Management generated approximately $194,000 in earnings before interest,

21   taxes and depreciation and amortization ("EBITDA"), on revenues of approximately $5,000,000,

22   during the twelve month period ending on December 26, 2010. Financial statements for Forbco

23   Management are attached, collectively, as Exhibit "1" to the Higgins Declaration.

24        Forbco Management's primary secured creditor is First Franchise. On

25   November 10, 2005, Forbco Management, Forbco Sizzler and Sizzler Family Steakhouse # 621[2]

26

27   [1] Except as otherwise defined herein, the definitions of the capitalized terms set forth herein are as contained in the Motion.

28   [2] Sizzler Family Steakhouse # 621 ("Sizzler Family Steakhouse") is an affiliate of the Debtors that has not filed for relief under the Bankruptcy Code.

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

1    executed in favor of First Franchise a promissory note in the original principal amount of

2    approximately $3,177,525 ("Note No. 1"). First Franchise asserts that Note No. 1 is secured by a

3    security interest encumbering substantially all of the assets of Forbco Management, including

4    inventory.  First Franchise asserts that, as of the Petition Date, the approximate amount of

5    $710,000 was owed with respect to Note No. 1.

6           The Internal Revenue Service ("IRS") and the California State Board of

7    Equalization ("SBE") also assert secured claims against Forbco Management in the approximate

8    amounts of $395,222 and $394,532 respectively. Both the IRS and SBE contend that such claims

9    are secured by liens against substantially all of Forbco Management's assets, including inventory.

10          Other smaller Secured Claimants asserting claims against Forbco Management

11   include: Canyon Plaza Shopping Center, which on or about October 13, 2010 filed a judgment lien

12   against Forbco Management's assets; and VMW Group, LLC ("VMW Group"), which on or about

13   December 23, 2008 filed a UCC-1 financing statement encumbering substantially all of the assets

14   of the Debtors, except for L&G.

15          **2.     Forbco Sizzler.** Forbco Management operates Sizzler restaurants from the

16   following leased locations:

17
| Store No. 24 | 101 N. Village Court, San Dimas, CA 91733 |
18   | Store No. 25 | 9588 Baseline Road, Rancho Cucamonga, CA 91701 |
19   | Store No. 30 | 6631 Clay Street, Pedley, CA 92509 |
20   | Store No. 37 | 900 E. Alosta Avenue, Azusa, CA 91702 |

21          Forbco Sizzler generated approximately $124,000 in EBITDA, on revenues of

22   approximately $5.4 million, during the twelve month period ending on December 26, 2010.

23   Financial statements for Forbco Sizzler are attached, collectively, as Exhibit "2" to the Higgins

24   Declaration.

25          The primary Secured Claimant with respect to Forbco Sizzler is First Franchise.  As

26   stated hereinabove, on or about November 10, 2005, Forbco Sizzler, Forbco Management and

27   Sizzler Family Steakhouse executed in favor of First Franchise Note No. 1 in the original principal

28   amount of approximately $3,177,525.  First Franchise asserts that Note No. 1 is secured by a

1  security interest encumbering substantially all of the assets of Forbco Sizzler, including inventory.

2  First Franchise asserts that, as of the Petition Date, the amount of approximately $710,228 was

3  owed with respect to Note No. 1.

4          The Internal Revenue Service ("IRS") and the California State Board of

5  Equalization ("SBE") also assert secured claims against Forbco Sizzler in the approximate

6  amounts of $547,217 and $1,054,041 respectively. Both the IRS and SBE contend that such claims

7  are secured by liens against substantially all of Forbco Sizzler's assets, including inventory.

8          Other alleged Secured Claimants asserting smaller claims against Forbco Sizzler

9  include: Norco Center, LLC, which on or about January 5, 2011 filed a judgment lien against the

10  assets of Forbco Sizzler; the California Employment Development Department ("EDD"), which on

11  or about September 22, 2010 filed a lien against the assets of Forbco; and VMW Group, which as

12  stated hereinabove, asserts that it holds a lien against the Debtors (other than L&G).

13          **3.    W&J.** W&J operates Sizzler restaurants from the following leased

14  locations:

| Store No. 102 | 15 West Del Amo Blvd., Long Beach, CA 90805 |
| Store No. 105 | 20755 South Avalon Blvd., Carson, CA 90746 |
| Store No. 108 | 33002 Yucaipa Blvd., Yucaipa, CA 92399 |
| Store No. 135 | 1461 South Rimpau Corona, CA 92879 |

19          W&J generated approximately $232,000 in EBITDA, on revenues of $4.8 million,

20  during the twelve month period ending on December 26, 2010.  Financial statements for W&J are

21  attached, collectively, as Exhibit "3" to the Higgins Declaration.

22          The primary Secured Claimant with respect to W&J is First Franchise.  On

23  November 10, 2005, W&J executed in favor of First Franchise a promissory note in the original

24  principal amount of approximately $1,987,646 ("Note No. 2").  First Franchise asserts that Note

25  No. 2 is secured by a security interest, granted in favor of First Franchise, encumbering

26  substantially all of the assets of W&J, including W&J's inventory.  First Franchise asserts that, as

27  of the Petition Date, the amount of $1,205,618 was owed with respect to Note No. 2.

28

-8-

1    The Internal Revenue Service ("IRS") and the California State Board of

2    Equalization ("SBE") also assert secured claims against W&J in the approximate amounts of

3    $417,177 and $1,007,162 respectively. Both the IRS and SBE contend that such claims are secured

4    by liens against substantially all of W&J's assets, including inventory.

5    Other alleged Secured asserting smaller claims against W&J include: the EDD,

6    which on or about January 14, 2011 filed a lien against the assets of W&J; and VMW Group,

7    which as stated hereinabove, asserts against the Debtors (other than L&G).

8    **4.    L&G.** L&G operates Sizzler restaurants from the following leased

9    locations:

| Store No. 205 | 3755 Murphy Canyon Road, San Diego, CA 92123 |
| Store No. 225 | 4017 E. Main Street, Ventura, CA 90003 |

12    L&G generated approximately $106,000 in EBITDA, on revenues of $2.7 million,

13    during the twelve month period ending on December 26, 2010.  Financial statements for L&G are

14    attached, collectively, as Exhibit "4" to the Higgins Declaration.

15    The primary Secured Claimant with respect to L&G is First Franchise.  On or about

16    November 10, 2005, L&G granted in favor of First Franchise a promissory note in the original

17    principal amount of approximately $1,987,646 ("Note No. 3").  First Franchise asserts that Note

18    No. 3 is secured by a security interest, executed in favor of First Franchise, encumbering

19    substantially all of the assets of L&G, including L&G's inventory.  First Franchise asserts that, as

20    of the Petition Date, the amount of $319,910 was owed with respect to Note No. 3.

21    The Internal Revenue Service ("IRS") and the California State Board of

22    Equalization ("SBE") also assert secured claims against L&G in the approximate amounts of

23    $191,442 and $422,658 respectively. Both the IRS and SBE contend that such claims are secured

24    by liens against substantially all of L&G's assets, including inventory.

25    Other smaller Secured Claimants asserting claims against L&G include: the EDD,

26    which on or about November 8, 2010 filed a lien against the assets; and Entrust Great Lakes, LLC,

27

28

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

1    et al. ("Entrust"), which on February 13, 2009 filed a UCC-1 financing statement encumbering

2    assets of L&G.

3    **B.    Events Precipitating Debtors' Chapter 11 Filings**.  The Debtors' financial

4    difficulties have their roots in the sudden and severe downturn in the United States economy

5    beginning in mid-year 2007. As a result of this downturn, sales revenues during the July 2007

6    through 2008 time frame declined, on average, more than 15%.  This reduction in revenues,

7    coupled with the costs that the Debtors incurred in litigation their franchisor, caused severe cash

8    flow problems and substantial third party payment arrearages.  The instant Chapter 11 filing will

9    provide the Debtors a breathing spell within which to propose a reorganization plan, while

10    concurrently enabling the Debtors to preserve the going concern value of their business operations.

11    **C.    The Debtors' Cash Collateral Proposal**.  As is the case with any restaurant

12    business, a substantial percentage of the revenues generated by the Debtors is attributable to the

13    delivery of services.  The amount of the Debtors' revenues attributable to services is not "cash

14    collateral."  In contrast, the relatively limited amount of revenues that is attributable to, or more

15    accurately "replaces," inventory expended in operations is "cash collateral."  Accordingly, the

16    Debtors' adequate protection burden is limited to ensuring that the level of inventory on hand as of

17    the Petition Date is replaced adequately through ongoing operations.

18        For example, in order for the Debtors to meet the Debtors' adequate protection burden, if

19    the Debtors expend one dollar of inventory, this inventory must be replaced by one dollar of

20    collections, which, in turn, must be reinvested in additional inventory having a value, again, of at

21    least one dollar.  Similarly, to the extent that a Secured Claimant has an interest in the Debtors'

22    cash on hand as of the Petition Date,[3] if the Debtors use such cash collateral to acquire additional

23    inventory, as they must, this inventory, through the operations of the Debtors' businesses, must be

24    converted into one dollar of replacement cash collections. All cash and collections above these

25    required "floors" generated after the Petition Date are attributable to services (cooking, dining

26    service, etc.) and do not constitute "cash collateral."

27

28    _____

[3] The Debtors believe that no Secured Claimant has a perfected interest in the Debtors' cash.

1    To ensure that the Secured Claimants' existing interests, if any, in inventory and cash are

2    preserved, the Debtors have disclosed in that Petition Date Cash Collateral Report, attached as

3    Exhibit "5" to the Higgins Declaration, the amounts of inventory and cash on hand at their

4    restaurants as of the Petition Date.  These disclosures provide the Secured Claimants their

5    benchmark for adequate protection purposes.  This is the amount of the cash collateral that the

6    Debtors propose to protect on an interim basis.  On a going forward basis, the Debtors will ensure

7    that the combination of cash and inventory does not fall below this benchmark.

8    The evidence before the Court establishing that the Debtors can and will achieve the

9    foregoing level of protection is presented in the exhibits to the Higgins Declaration.  As the

10    financial statements of the Debtors attached as Exhibits "1" through "4" to the Higgins

11    Declaration indicate, during the past year, and at the present time, the Debtors are generating

12    positive EBITDA.  Accordingly, for each dollar of cash collateral expended in the Debtors'

13    operations, they are generating not only one dollar of replacement value, but in fact are generating

14    additional dollars over and above this minimum threshold.

15    The Debtors' Cash Flow Projections, attached as Exhibit "6" to the Higgins Declaration,

16    confirm that each of the Debtors will be able to operate on a cash flow positive basis during the

17    first twenty-six (26) weeks after the Petition Date, and that the Debtors' cash will increase over

18    such time period.  The Debtors' Cash Collateral Projections, attached as Exhibit "6" to the

19    Higgins Declaration, indicate that the amount of the Debtors' cash and inventory will be

20    maintained, at all times during the first twenty-six (26) weeks after the Petition Date, in an amount

21    not less than the amount of cash and inventory as of the Petition Date and, in fact, cash and

22    inventory levels will increase during such time period.

23    Based upon the foregoing, the Debtors hereby propose to provide to the Secured Claimants

24    the following protections with respect to the use of any cash collateral of the Secured Claimants in

25    this case:

26    1.    **Replacement Liens.**  As and for adequate protection of the Debtors' use of

27    any cash collateral of the Secured Claimants, the Debtors will grant to each of the Secured

28    Claimants replacement liens encumbering each of the respective Debtors' post-petition cash and

-11-

inventory, and the proceeds of the foregoing, to the same extent and priority as any duly perfected and unavoidable liens in cash collateral held by the respective Secured Claimants as of the Petition Date, limited to the amount of any such cash collateral of the respective Secured Claimants as of the Petition Date, to the extent that any cash collateral of the respective Secured Claimants is actually used by the respective Debtors.

        2.    **Reservation of Rights.**  The Debtors, any Committee, and all other parties-in-interest will reserve any and all rights that they may have to object to the claims of the Secured Claimants and to object to the validity, priority and extent of the Secured Claimants' liens, if any, encumbering the Debtors' assets.  Without limiting the generality of the foregoing, the Debtors will reserve the right to object to the extent of any liens that the Secured Claimants may assert in the Debtors' cash as of the Petition Date.

        3.    **Financial Reporting.**  The Debtors will provide to the Secured Claimants reports regarding the amounts of cash and inventory that each Debtor has as of the end of each reporting period versus the amount of cash and inventory that each Debtor had as of the Petition Date.  These initial cash collateral reports will be provided to each Secured Claimant about two weeks after the Petition Date, and thereafter the Secured Claimants will receive a monthly report with this information.  Moreover, the Debtors will provide to the Secured Claimants copies of the interim statements and operating reports required to be submitted to the U.S. Trustee, as such documents are submitted to the U.S. Trustee.

        4.    **Final Hearing.**  The Debtors will reserve the right to seek, at the final hearing on this Motion, use of cash collateral different from that set forth herein.

        As the historical financials and the cash collateral projection attached, respectively, as Exhibits "1" through "4" and "6" to the Higgins Declaration confirm, if the Debtors are allowed to continue operations and to use their existing cash and inventory in the ordinary course of their operations, they will generate positive cash flow and the amounts of their cash and inventory will increase substantially, thereby ensuring the preservation of the Secured Claimants' interests in cash collateral.  In contrast, if the Debtors are denied the use of cash collateral, they may be unable to provide customers ongoing high quality dining services, and the value of the Secured

1  Claimants' collateral, and in fact the Debtors' entire business enterprise, may suffer immediate

2  and perhaps irreparable harm.

3  <center>II.</center>

4  ## THE SECURED CLAIMANTS DO NOT HAVE AN INTEREST IN REVENUES

5  ## GENERATED FROM THE DEBTORS' POST-PETITION SERVICES

6  Pursuant to Section 552(a) of the Bankruptcy Code, a secured creditor's pre-petition liens

7  will <u>not</u> extend to property generated by a debtor post-petition, unless this property constitutes

8  "proceeds" of the creditor's pre-petition collateral.  11 U.S.C. § 552(a).[4]  <u>See also</u>, <u>In re Texas Tri-

9  Collar, Inc.</u>, 29 B.R. 724 (Bankr. W.D.La. 1983) (pursuant to Section 552, a creditor's pre-petition

10  blanket lien does <u>not</u> extend to post-petition receivables);[5] <u>In re Delbridge</u>, 61 B.R. 484 (Bankr.

11  E.D.Mich. 1986) (pre-petition security interest in accounts receivables does not extend to post-

12  petition receivables by operation of § 552); <u>In re Big Hook Land & Cattle Co.</u>, 81 B.R. 1001

13  (Bankr. D.Mont. 1988) (post-petition increases in cattle herd through calf crop are not subject to

14  lien resulting from after-acquired property clause in security agreement and are therefore cut off by

15  § 552(a)); <u>In re Transp. Design & Technology, Inc.</u>, 48 B.R. 635 (Bankr. S.D.Cal. 1985) (patent

16  issued to debtor after filing petition does not constitute proceeds of pre-petition patent; it was

17  instead after-acquired property and operation of § 552(a) cuts off creditor's interest); <u>In re

18  Hamilton</u>, 18 B.R. 868 (Bankr. Colo. 1982) (crops planted after petition are after-acquired property

19  and § 552(a) cuts off lien).

20

21  [4] Section 552(a) provides as follows:
       (a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor
22     after the commencement of the case is not subject to any lien resulting from any security agreement
       entered into by the debtor before the commencement of the case.
23  11 U.S.C. § 552(a).
    [5] The <u>Texas Tri-Collar</u> court stated as follows:
24     "Given the fact that this security agreement was entered into by [the debtor] before the commencement
       of the case, and considering that the receivables generated by [the debtor] after the filing of the petition
25     are "property acquired by the estate or by the debtor after the commencement of the case", the lien
       resulting from the assignment by [the debtor] to First National is rendered ineffective as to postpetition
26     receivables by operation of section 552(a). [¶]
       . . . Since accounts receivable generated after commencement of the case are in no way proceeds,
27     product, offspring, rents or profits of prepetition accounts receivable, First National's security interest,
       pursuant to the Assignment and Pledge of Accounts Receivable, does not extend to postpetition
28     receivables under section 552(b). [¶]
    29 B.R. at 726-727.

<center>-13-</center>

1    In this regard, the noted treatise on bankruptcy law, Collier on Bankruptcy, states as

2    follows:

3    　It must be emphasized that subsection (b)(1) creates an exception for proceeds,
     product, offspring or profits generated by pre-petition collateral, and **not for**
4    **'after-acquired' property obtained by the debtor or the estate postpetition.**

5    Collier on Bankruptcy 15th Ed. Revised, ¶ 552.02[1] (1998) (emphasis added).

6    　In the case of a debtor/restaurant operator, the debtor generates revenue from two primary

7    sources:  the delivery of goods **and the delivery of services**.  Although a secured creditor may

8    assert a lien on the inventory and cash held by the debtor as of the filing of the debtor's petition,

9    **the creditor's lien will not extend to the cash generated from the "services" component of the**

10   **debtor's business.**  See, 11 U.S.C. § 552(a).  The cash from services is "after acquired property"

11   and remains free and clear of the secured creditor's lien.  In re Skagit Pacific Corporation, 316

12   B.R. 330 (9th Cir. BAP 2004) ("Furthermore, revenue generated by the operation of a debtor's

13   business, post-petition, is not considered proceeds if such revenue represents compensation for

14   goods and services rendered by the debtor in its everyday business performance); In re Cafeteria

15   Operators, L.P., 299 B.R. 400, 405 (Bankr. N.D.Tex. 2003) (revenue generated post-petition solely

16   as a result of a debtor's labor is not subject to a creditor's pre-petition lien; the creditors' lien

17   reaches only the value of inventory sold by the debtor, and not the sale increment attributable to

18   the debtor's services); In re Timothy Dean Restaurant & Bar, 342 B.R. 1 (Bankr. D.C. 2006).

19   Accordingly, all post-petition revenues generated by a debtor over and above the cost of the

20   inventory sold by the debtor are not "cash collateral."

21   　In this case, although the Secured Claimants assert liens against substantially all of the

22   assets of the Debtors, and on the proceeds generated from this collateral, it is important to

23   recognize that a substantial part of the Debtors' post-petition income will be cash generated from

24   services.  The Debtors' post-petition cash collections, to the extent that they are generated from

25   post-petition services, constitute after-acquired property pursuant to Section 552(a) of the

26   Bankruptcy Code, that is not subject to any of the exceptions provided for in Section  552(b) of

27

28

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

1   the Bankruptcy Code.[6]  See, In re Bering Trader, Inc., 944 F. 2d 500, 502 (9th Cir. 1991); In re

2   Days Inn California Riverside Limited Partnership, 27 F. 3d 374, 377 (9th Cir. 1994) ("The

3   revenues derived from the sale of food and drink and from other services provided by the hotel

4   generate "accounts" that cannot be classified as rent. ... The equitable purposes of bankruptcy and

5   the balancing purpose of § 552 require us to distinguish the two types of revenues."); In re Everett

6   Home Town Limited, 146 B.R. 453 (Bankr. D.Ariz. 1992) (cart fees, greens fees and restaurant

7   revenues not cash collateral); In re McKim, 217 B.R. 97 (Bankr. D.R.I. 1998) (green fees are not

8   cash collateral); See also, In re Hotel Sierra Vista Ltd. Partnership, 112 F.3d 429, 432 (9th Cir.

9   1997) ("Our decision in Days Inn California provides the formula for determining the amount of

10  revenues to which liens may survive post-petition. In Days Inn California, we stated that Hotel

11  methods of accounting will permit the identification of the revenues generated by the rooms and

12  those generated by services. Determination of the net revenues will require allocation of direct and

13  indirect expenses in proportion to each category of revenue. ... Thus, proving the extent of one's

14  interest involves submitting evidence that enables the bankruptcy court to determine the sum to

15  which the party asserting the security interest is entitled").  Accordingly, the Debtors' adequate

16  protection burden in these cases extends only to the limited value attributable to any interest of the

17  Secured Claims in cash on hand as of the Petition Date, and an allocation of the proceeds

18  generated from the use of food inventory on hand as of the Petition Date.  The value of this

19  collateral pool and the proceeds thereof is very limited, and sufficient replacement collateral will

20  be generated through the Debtors' post-petition operations in order to provide to the Secured

21  Claimants adequate protection of any interests that they may have therein.

22

23

24

25  [6] Section 552(b)(1) of the Bankruptcy Code states as follows:
        Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity
26      entered into a security agreement before the commencement of the case and if the security interest created by such
        security agreement extends to property of the debtor acquired before the commencement of the case and to
        proceeds, products, offspring or profits of such property, then such security interest extends to such proceeds,
27      products, offspring or profits acquired by the estate after the commencement of the case to the extent provided by
        such security agreement and applicable nonbankruptcy law, except to the extent that the court, after notice and a
28      hearing and based on the equities of the case, orders otherwise.
     11 U.S.C. § 552(b)(1).

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

# III.

## THE DEBTORS SHOULD BE AUTHORIZED TO USE ANY CASH

## COLLATERAL OF THE SECURED CLAIMANTS PURSUANT TO 11 U.S.C. § 363

The provisions of Section 363(c)(2) of the Bankruptcy Code govern a debtor's use of cash collateral. Section 363(c)(2) provides, in pertinent part, as follows:

> The trustee [or debtor in possession] may not use, sell or lease cash collateral.... unless:
> (A)  each entity that has an interest in such cash collateral consents; or
> (B)  the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

Therefore, a court may authorize a debtor's use of a creditor's cash collateral in the absence of creditor consent. <u>See</u>, 11 U.S.C. § 363(c)(2)(B).

Section 363(e) of the Bankruptcy Code provides that, upon the request of an entity that has an interest in property proposed to be used by the debtor, the court may prohibit or condition such use "as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363 (e).

The Bankruptcy Code clearly delineates the party which bears the burden of proof on the relevant cash collateral issues:

> (1)  the trustee [or debtor in possession] has the burden of proof on the issue of adequate protection; and
>
> (2)  the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.

11 U.S.C. § 363(p).

Therefore, this Court may authorize the Debtors' use of any cash collateral of the Secured Claimants upon determining that the interests of the Secured Claimants in the cash collateral will be adequately protected. In re McCombs Properties VI, Ltd., 88 B.R. 261 (Bankr. C.D.Cal. 1988).

**A.    The Adequate Protection Burden.**  In the case, <u>United Savings v. Timbers of Inwood Forest</u>, 484 U.S. 365, 108 S.Ct. 626 (1988), the United States Supreme Court analyzed and quantified the parameters of the "interest in property," referenced in Sections 361, 362(d)(1), and 363(e), which the Bankruptcy Code undertakes to protect, where required, through adequate

1    protection. This analysis led the Supreme Court in <u>Timbers</u> to the conclusion that the "interest in

2    property" referenced in the above sections of the Bankruptcy Code means, and is limited to, the

3    "value of the Collateral." <u>Timbers</u>, 108 S.Ct. at 630. Therefore under the <u>Timbers</u> analysis, the

4    adequate protection provisions in the Bankruptcy Code protect a secured creditor only from a

5    potential <u>diminution in the value of that creditor's collateral</u> during the post-petition period. <u>Id</u>.

6        The "value" oriented adequate protection analysis adopted by the Supreme Court in the

7    <u>Timbers</u> case has been closely adhered to by the courts which have had occasion to address this

8    issue. <u>See e.g.</u>, <u>In re Ledgemere Land Corp.</u>, 116 B.R. 338, 343 (Bankr. D.Mass. 1990) (so long

9    as the receivables being collected and used by the debtor are being replaced by sufficient new

10   receivables in which the creditor is granted a security interest, the creditor is adequately

11   protected); <u>In re Johnson</u>, 90 B.R. 973, 978 (Bankr. D.Minn. 1988) (secured creditor is not

12   impaired and is not entitled to receive adequate protection payments where value of collateral does

13   not decline); <u>In re Century Inv. Fund, VII Ltd. Partnership</u>, 96 B.R. 884, 887 (Bankr. E.D.Wis.

14   1989) (where value of collateral appears to be stable, secured creditor is not entitled to adequate

15   protection payments); <u>In re Anderson</u>, 86 B.R. 877, 889 (Bankr. N.D.Ind. 1988) (secured creditor

16   was required to show a necessity for adequate protection by demonstrating a decline in asset value

17   from the petition date); <u>In re Kessler</u>, 86 B.R. 134, 136 (Bankr. C.D.Ill. 1988) (under <u>Timbers</u>,

18   movants are not entitled to adequate protection payments, as there was no showing that property

19   was depreciating in value).

20       In <u>In re Elmore</u>, 94 B.R. 670, 677 (Bankr. C.D.Cal. 1988), the Honorable Samuel Bufford

21   held that:

22           [T]he Court finds that the property is not depreciating in value. In consequence,
             the Court finds that Lomas [Secured Creditor] is adequately protected by the

23           value of its collateral... The right to receive payments is a simple contract right
             that supports only a claim in the bankruptcy case. There is no other adequate

24           protection to which Lomas is entitled under the Bankruptcy Code.

25   <u>Elmore, supra</u>, 94 B.R. at 677 (citation omitted).

26       In <u>In re McCombs</u>, the Honorable John E. Ryan held that:

27           The analysis of the Supreme Court in <u>Timbers</u> is instructive here. <u>The phrase</u>
             <u>"interest in property" in § 363(e) means the value of the collateral. That is the</u>

28

1    interest that I am required to protect. If that value is likely to diminish during
the time of the use, adequate protection must be provided by the Debtor.

2    McCombs, supra, 88 B.R. at 266 (emphasis added). Accord, In re Delta Resources, Inc., 54 F.3d

3    722, 730 (11th Cir.), cert. denied, 64 U.S.L.W. 3348 (1995); In re Westchase I L.P., 126 B.R. 692,

4    694-95 (W.D.N.C. 1991).

5    Under the strict value-oriented analysis adopted by the Supreme Court in Timbers (and

6    adhered to by the well-reasoned cases cited above), the adequate protection inquiry under

7    Section 363(e) is limited to determining whether the debtor's use of a secured creditor's cash

8    collateral will reduce the value of the creditor's collateral base. If the debtor can establish that the

9    proposed use of the collateral will not cause a decline in the value of the collateral, then court

10    authorization of such use is appropriate.

11    Not infrequently, a secured creditor will contend that it somehow has a right to be paid

12    adequate protection payments, post-petition, even where no decline in the value of the collateral is

13    either occurring or anticipated. The Supreme Court in Timbers expressly rejected this very

14    contention stating:

15    > It is obvious (since §§ 361 and 362(d)(1) do not entitle the secured creditor to
> immediate payment of the principal of his collateral) that this "realization" is to
16    > "result" not at once, but only upon completion of the reorganization. It is then
> that he must be assured "realization … of the indubitable equivalent" of his
17    > collateral.

18    Timbers, 108 S.Ct. at 633.

19    The law, then, is clear: no adequate protection payments are required unless there is a

20    decline post-petition in the value of the secured creditor's collateral which actually impairs the

21    creditor's secured claim. As set forth in detail below, and as evidenced by the Higgins

22    Declaration, the Debtors' proposal to use any cash collateral of the Secured Claimants provides

23    adequate protection to the Secured Claimants.

24    **B.    The Debtors Have Satisfied Their Adequate Protection Burden.** Under the

25    Debtors' cash collateral proposal, the Secured Claimants' interests in any cash collateral will be

26    adequately protected from a diminution in value through (i) replacement liens granted to the

27

28

MAINDOCS-#157408-v3-Forbco  CashCollateralMotion.DOC

1   Secured Claimants; (ii) through the maintenance and preservation of the Debtors' businesses; and

2   (iii) the projected substantial increase in cash and inventory during these cases.

3        **1.**   **The Secured Claimants' Interests Are Adequately Protected by the**

4   **Proposed Replacement Liens.**  Under the Debtors' cash collateral proposal, each of the Secured

5   Claimants will be granted a post-petition replacement lien on cash and inventory, and the proceeds

6   acquired and/or generated with any cash collateral, with a value equal to the amount of any pre-

7   petition cash collateral expended by each of the respective Debtors.  For example, if a Debtor uses

8   $10,000 of pre-petition cash collateral, the relevant Secured Claimant will be granted a lien, to the

9   extent of $10,000, in the proceeds of the cash collateral.

10       However, since the function of adequate protection is only to <u>preserve</u> and not to

11   <u>increase</u> the collateral subject to a secured creditor's interest, any additional value created through

12   the Debtors' use of the cash collateral, whether in the form of inventory or cash, will <u>not</u> be

13   subject to a replacement lien, but will instead constitute an asset of the estate that <u>all</u> creditors will

14   ultimately be able to look for payment.  <u>See</u>, <u>Ledgemere</u>, <u>supra</u>, 116 B.R. at 343 (so long as the

15   receivables being collected and used by the debtor are being replaced by sufficient new

16   receivables in which the creditor is granted a security interest, the creditor is adequately

17   protected).  Thus, each of the respective Secured Claimants' replacement liens should be limited

18   to the amount of any cash collateral in existence as of the Petition Date.

19       Although the replacement lien will, in concept, ensure the preservation of the

20   Secured Claimants' interests in the cash collateral, in reality, the liens will perform this function

21   only if the Debtors, in fact, generate at least one dollar of value for every dollar of cash collateral

22   expended.  The evidence that addresses this issue is contained in the Higgins Declaration and,

23   specifically, the projections that are attached as Exhibits "5" and "7" thereto.  These projections,

24   along with the historical results of operations attached as Exhibits "1" through "4" to the Higgins

25   Declaration, confirm that the Debtors will operate on a cash flow positive basis during the

26   projected period, and that the Debtors' cash and inventory will increase substantially in value

27   during such period.

28

1    The Debtors believe that the projections of their business operations, as set forth in

2    the projections, are reasonable.  As set forth in the Higgins Declaration, the business assumptions

3    underlying the operations projected in the projections are reasonable and are essentially in

4    accordance with the Debtors' historical experience, as adjusted to take into account recent or

5    projected events (e.g., the cuts made to the Debtors' operating expenses).  Accordingly, the

6    Debtors believe that the projections establish that the proposed replacement liens being granted to

7    the Secured Claimants will adequately protect the Secured Claimants' alleged interests.

8    In summary, the Higgins Declaration provides evidence to establish with

9    reasonable certainty that the Debtors' use of any cash collateral of the Secured Claimants will

10   result in an increase in the estates' collateral pool, thereby adequately protecting the Secured

11   Claimants' interests in any cash collateral.

12        **2.    The Secured Claimants Are Adequately Protected by the Maintenance**

13   **and Preservation of the Debtors' Businesses.**  To determine the sufficiency of adequate

14   protection, a bankruptcy court should:  (i) establish the value of the secured creditor's interest;

15   (ii) identify the risk, if any, to the value of the secured creditor's cash collateral resulting from the

16   debtor's request for the use of the cash collateral; and (iii) determine whether the debtor's

17   adequate protection proposal protects the value of the cash collateral as nearly as possible against

18   risk to that value consistent with the concept of indubitable equivalence.  McCombs, supra, 86

19   B.R. at 267 (quoting In re Martin, 761 F.2d 472 (8th Cir. 1985)).

20        To establish the value of a secured creditor's interest, the bankruptcy court must

21   consider the purpose of the valuation, and the proposed disposition or use of the secured property.

22   See, 11 U.S.C. § 506(a).  "One of the primary factors to be considered in valuation is whether the

23   subject property is to be used and retained by the debtor or whether the property is to be disposed

24   of."  In re Kidsstop of America, Inc., 64 B.R. 397, 401 (M.D. Fla. 1986).

25        Here, the value of any cash collateral will depend, in part, upon the preservation of

26   the Debtors as going concerns.  It follows that the risk to this going concern value of cash

27   collateral (which risk is required to be identified by the Court in the McCombs test above) consists

28   of any cessation in the Debtors' business operations.  See, In re Glasstream Boats, Inc., 110 B.R.

-20-

1  611, 612 (M.D. Ga. 1990) (it was in the best interest of both the debtor-in-possession and the

2  creditor that the debtor "continue in its operation as a manufacturing facility" and that "denial of

3  this motion would result in another shut down of the assembly line, which the court doesn't feel is

4  in the best interest of either party."); In re Cann & Saul Steel Co., 76 B.R. 479, 483 (E.D.Pa.

5  1987) (continued operation of manufacturer debtor was in the best interest of secured creditor in

6  that it was likely that the secured creditor would realize more funds than it would by requiring the

7  debtor to cease operations); In re Stein, 19 B.R. 458, 460 (Bankr. E.D.Pa. 1982) (the bankruptcy

8  court allowed a debtor to use cash collateral where the secured party had no equity cushion for

9  protection, finding that the use of the cash collateral was necessary to the continued operations of

10  the debtor, and that the creditor's "secured position can only be enhanced by the continued

11  operation of the [debtor's business]"); In re Pine Lake Village Apartment Co., 16 B.R. 750, 756

12  (Bankr. S.D.N.Y. 1982) (debtor permitted to use cash collateral generated from rental income to

13  preserve the value of real property which also secured creditor's claim); In re Karl A. Neise, Inc.,

14  16 B.R. 600, 602 (Bankr. S.D.Fla. 1981) (marginally secured creditor adequately protected by lien

15  in post-petition property acquired by debtors; debtors can use cash collateral "in the normal

16  operation of their business").

17          As discussed at length in the Higgins Declaration, even a temporary cessation of

18  the Debtors' ability to operate their businesses, caused by any lack of access to any cash collateral,

19  will result in a substantial diminution of collateral of the Secured Claimants, as customers will

20  turn to competitors of the Debtors for their dining needs.  In contrast, maintenance of the Debtors'

21  ongoing operations will preserve the value of the Secured Claimants' interest in any cash

22  collateral as nearly as possible against any risk to that value, thus providing adequate protection.

23          **3.     The Secured Claimants Are Adequately Protected by a Projected**

24  **Increase in Cash and Inventory.** In Exhibit "5" to the Higgins Declaration, the Debtors list the

25  approximate levels of cash and inventory that were in existence as of the Petition Date. As set

26  forth in the Cash Collateral Projection, Exhibit "6" to the Higgins Declaration, the Debtors project

27  that, at all times during the first 26 weeks after the Petition Date, the Debtors will have more cash

28  and inventory than the amounts on hand as of the Petition Date.

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

1    The reasons for this projected increase in cash and inventory include the following:

2    (i) the Debtors' reduced expenses; (ii) enhanced marketing efforts; (iii) the stay of collection

3    activities by the SBE and other creditors which were draining the Debtors' cash, and which, in the

4    case of the SBE, prevented the Debtors from selling beer or wine and from accepting, from time to

5    time, credit card sales, thereby reducing the Debtors' sales revenues; and (iv) the cessation of the

6    Debtors' payments on prepetition arrearages owed to unsecured creditors.

7    For the reasons set forth hereinabove, the Debtors respectfully submit that they have met

8    their adequate protection burdens in these cases.

9                                    **IV.**

10    **THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL**

11    **IN ORDER TO PROMOTE A SUCCESSFUL REORGANIZATION**

12    In <u>In re O'Conner</u>, 808 F.2d 1393 (10th Cir. 1987), the Tenth Circuit Court of Appeals

13    recognized that the ultimate goal of Chapter 11 proceedings is to enhance the prospects of

14    reorganization. In this regard, the Tenth Circuit stated as follows:

15    [T]he Debtors' efforts are not only to be encouraged, but also their efforts

16    during the administration of the proceeding are to be measured in light of that
quest. Because <u>the ultimate benefit to be achieved by a successful</u>

17    <u>reorganization inures to all the creditors of the estate</u>, a fair opportunity must be
given to the Debtors to achieve that end…

18

19    <u>In order to encourage the Debtor's efforts in the formative period prior to the</u>
<u>proposal of a reorganization, the court must be flexible in applying the adequate</u>

20    <u>protection standard.</u>

21    <u>Id.</u> at 1397-98 (emphasis added); <u>Accord,</u> <u>In re Dynaco Corp.</u>, 162 B.R. 389, 395 (Bankr. D.N.H.

22    1993) ("[T]he court will generally permit the business operations to continue, at least to the point

23    of plan formulation, if the debtors make a solid evidentiary showing to support their

24    projections…"); <u>In re Heatron, Inc.</u>, 6 B.R. 493, 496 (Bankr. W.D.Mo. 1980) ("At the beginning

25    of the reorganization process the Court must work with less evidence than might be desirable and

26    should resolve issues in favor of the reorganization where the evidence is conflicting.").

27    Here, a determination to grant to the Debtors use of any cash collateral will help promote

28    the Debtors' successful reorganization, as it will allow the Debtors to continue, uninterrupted, the

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

1   normal operations of their businesses.  The Debtors' efforts to successfully reorganize their

2   financial affairs, in turn, will be to the ultimate benefit of the Secured Claimants, by preserving

3   and enhancing the value of their alleged secured interests.  In Cann & Saul, supra, the court found

4   the debtor's prospects for a successful reorganization to be a major factor in determination of

5   adequate protection:

6           It is far more significant in the weight of considerations as to whether a creditor
            is "adequately protected" to analyze debtor's prospects for a successful
7           reorganization in Chapter 11.  If these prospects are strong… then the measure of
            the secured creditor's adequate protection is the probability that the debtor will
8           be able to propose an effective plan.

9   76 B.R. at 485 (emphasis added).

10          In Cann & Saul, the debtor (a steel manufacturer that had been in business for almost a

11  century) had been losing money each year for a period of at least four years prior to the filing of

12  its Chapter 11 petition.  However, the court found that the debtor had strong potential for

13  reorganization, given such factors as the debtor's production of high quality product, the debtor's

14  stability and good public image, and the debtor's acceptance of changes necessary for maintaining

15  its labor force.  Id. at 487-88.

16          The Debtors' restaurants have a good public image and they are currently generating

17  positive earnings (EBITDA) from operations.  If the Debtors are authorized to use cash collateral,

18  the value of their business enterprise will be preserved and this enterprise ultimately will provide a

19  source of repayment for all creditors. In contrast, if the Debtors are denied use of cash collateral,

20  they may be forced to close their businesses and to cease operations.

21          A cessation of operations, even temporarily, would cause irreparable damage to the

22  Debtors' businesses in the form of customer defections, employee attrition, lost revenues and loss

23  of goodwill.  If the Debtors were permanently prohibited from using cash collateral, they may be

24  forced to close operations, and their assets then would need to be liquidated, yielding proceeds

25  totaling a fraction of what the Debtors could generate by continuing operations and by

26  reorganizing their financial affairs.  In this regard, it is very likely that any liquidation of the

27  Debtors' assets would be a financial disaster for creditors in these cases.  As is the case with

28

1  many, if not most, restaurant operators (or other essentially service-oriented businesses), the

2  Debtors do not have real property assets or other very valuable "hard" assets which, if liquidated,

3  would yield substantial recoveries by creditors.  Rather, the Debtors' assets consist essentially of

4  real property leases of uncertain market value, inventory, and used restaurant furniture, fixtures

5  and equipment which, if liquidated, particularly in this difficult economy, likely will not generate

6  proceeds sufficient to produce any meaningful recovery by unsecured creditors.  The only means

7  for the Debtors' unsecured creditors to obtain any favorable recovery in these cases is for the

8  Debtors to remain in business and to use profits generated from operations, and proceeds from the

9  sales of restaurants as going concerns, to fund a Chapter 11 plan of reorganization.  Therefore,

10  rather than force upon the Debtors and their creditors the unfortunate results associated with a

11  liquidation of the Debtors at this very early stage of the cases, the Court should permit the Debtors

12  to use any cash collateral in order to preserve their ability to reorganize.  See, In re George

13  Ruggiere Chrysler-Plymouth, Inc. 727 F.2d 1017, 1019 (11th Cir. 1984) ("Without the availability

14  of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional

15  policy favoring rehabilitation over economic failure would be frustrated."); Dynaco, 162 B.R. at

16  396 (finding that the alternative to the debtor's use of cash collateral – forced termination of its

17  businesses – would doom any reorganization and any chance to maximize values for all creditors).

18  <div align="center">V.</div>

19  <div align="center">**GOOD CAUSE EXISTS FOR HEARING THIS**</div>

20  <div align="center">**MOTION ON AN EMERGENCY BASIS**</div>

21  In recognition of the fact that Section 363(c) of the Bankruptcy Code operates to deprive a

22  debtor of the use of critical operating capital as of the filing of the debtor's Chapter 11 petition,

23  Congress specifically provided in Section 363(c)(3) that a hearing on cash collateral "shall be

24  scheduled in accordance with the needs of the debtor."  Accordingly, the Bankruptcy Code

25  expressly anticipates and authorizes expedited hearings on the issue of cash collateral use.  See, 11

26  U.S.C. § 363(c)(3).

27  Similarly, the Ninth Circuit Court of Appeals has recognized that immediate interim relief

28  may be crucial to the success of a corporate reorganization:

<div align="center">-24-</div>

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

> We realize that 'in certain circumstances, the entire reorganization effort may be thwarted if emergency leave is withheld' and that reorganization under the Bankruptcy Code 'is a perilous process, seldom more so than at the outset of the proceedings when the debtor is often without sufficient cash flow to fund essential business operations.' It is for this reason that Congress specified that hearings concerning the use of cash collateral 'shall be scheduled in accordance with the needs of the debtor.'

In re Center Wholesale, Inc., 759 F.2d 1440, 1449 n.21 (9th Cir. 1985) (emphasis added) (citations omitted).  See also, In re Sullivan Ford Sales, 2 B.R. 350, 355 (Bankr. D.Me. 1980).

As set forth in the Higgins Declaration, the Debtors must have the immediate use of any cash collateral to meet payroll obligations, to meet the daily costs and expenses of operating their businesses, to promptly pay their vendors, and to acquire goods and services to keep their businesses operating.  Any delay in the Debtors' ability to meet one or more of the aforementioned operating needs could deprive the Debtors of their ability to successfully reorganize their financial affairs.

## VI.

### THE COURT SHOULD SCHEDULE A FINAL HEARING ON THIS MOTION AS SOON AS POSSIBLE IN ACCORDANCE WITH THE REQUIREMENTS OF THE BANKRUPTCY RULES

By this Motion, the Debtors are requesting that the Court schedule a final hearing on this Motion as soon as possible in accordance with the requirements of the Federal Rules of Bankruptcy Procedure.

Rule 4001(b)(2) of the Federal Rules of Bankruptcy Procedure provides that the Court may commence a final hearing on this Motion no earlier than fourteen (14) days after service of the Motion.  The Debtors need to obtain as promptly as possible approval of the final use of cash collateral in order to ensure the Debtors' employees and vendors that the Debtors will be able to pay, during the course of these cases, their ordinary operating expenses including, without limitation, payroll and the expenses of maintenance and operation of their businesses.  A final hearing on this Motion should be held as soon as possible after the expiration of the fourteen (14) day period provided for by Rule 4001(b)(2) of the Federal Rules of Bankruptcy Procedure, in

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC

1  order to prevent the substantial damage to the Debtors' businesses which would result from any

2  loss of support of the Debtors' customers, employees and vendors caused by any lack of

3  confidence that the Debtors will have the ability to use cash collateral during their cases.

4  **VII.**

5  **THE NOTICE OF THIS MOTION PROPOSED TO BE GIVEN TO**

6  **CREDITORS AND OTHER PARTIES-IN-INTEREST IS APPROPRIATE**

7  **UNDER THE FACTS AND CIRCUMSTANCES OF THE DEBTORS' CASES**

8  As of the filing of this Motion, no trustee, examiner or Committee has been appointed in

9  the Debtors' Chapter 11 cases.  In accordance with the provisions of Bankruptcy

10  Rule 4001(b)(1), notice of this Motion has been given via e-mail or overnight mail to the U.S.

11  Trustee, to the Secured Claimants or to their counsel, and to each of the Debtors' twenty largest

12  general unsecured, non-insider creditors.

13  Because of the exigencies of the Debtors' cases and the irreparable harm to the Debtors,

14  their Chapter 11 estates, and all parties-in-interest that may ensue if the relief requested herein is

15  not granted, the Debtors submit that no further notice need be given.  No previous motion for the

16  relief sought herein has been made to this Court or to any other court.

17  **VIII.**

18  **CONCLUSION**

19  Based upon the foregoing, the Debtors respectfully request that this Court enter its order:

20  1.  Finding that the Secured Claimants' interests in any cash collateral are adequately

21  protected;

22  2.  Authorizing, on an interim basis pending final hearing on notice to creditors, the

23  Debtors' immediate use of any cash collateral of the Secured Claimants pursuant to

24  the terms and conditions contained in this Motion;

25  3.  Setting a final hearing on this Motion; and

26  ///

27

28

-26-

1        4.      Granting to the Debtors such other and further relief as the Court may deem just

2    and proper.

3    DATED:  February 9, 2011         **WINTHROP COUCHOT**

                                   **PROFESSIONAL CORPORATION**

4

5

                        By:___*/s/ Robert E. Opera*_____

6                                Robert E. Opera

7                                Kavita Gupta

                      [Proposed] General Insolvency Counsel for

8                          Debtors and Debtors-in-Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#157408-v3-Forbco_CashCollateralMotion.DOC